## MYERS v. CALLAGHAN.

*(Circuit Court, N. D. Illinois. July 6, 1885.)*

1. COPYRIGHT—INFRINGEMENT—DAMAGES—PROFITS ON SALE OF SECOND-HAND BOOKS BY INFRINGING PUBLISHER.

    A publisher who, having published and sold books in violation of the rights of the owner of the copyright, purchases such books and resells them, may be charged with the profit realized from the second sales, in addition to that realized from the first sales.

2. SAME—DETERMINING SELLING PRICE OF INFRINGING REPORTS FORMING PART OF FULL SETS SOLD.

    M. owned the copyright of volumes 39 to 46 of the Illinois Reports, and the state reporter the copyright for the later volumes. C., who owned the copyright of volumes 1 to 31, inclusive, republished and sold volumes 39 to 46, in violation of the rights of M., in full sets made up of the volumes owned by him, the infringing volumes, and volumes purchased from the reporter. *Held,* that the selling price of the infringing volumes might be determined with sufficient accuracy by deducting from the amount received for a full set of reports the amount paid for the volumes purchased from the state reporter, and then dividing the balance by 46.

3. SAME—EXPENSE OF INFRINGERS' BUSINESS.

    The report of the master as to the general average expenses of the infringer's business, which should be deducted from the proceeds of the sales of the infringing volumes, affirmed.

4. SAME—EXPENSES OF STEREOTYPING.

    An infringer will not be allowed to charge the cost of stereotyping the infringing volumes as a part of the expense of producing them.

5. SAME—PARTNERS' SALARIES.

    When the infringers are partners, and under the partnership agreement each member is entitled to draw out of the business for his personal expenses and support a specific sum per annum, the amounts so drawn out by the respective partners cannot be included as part of the general expenses of the firm in conducting its business, in order to arrive at the percentage of such expenses. *Rubber Co.* v. *Goodyear,* 9 Wall. 788, distinguished.

6. SAME—EXPENSE OF EDITORIAL WORK.

    The amount paid by an infringer for editing the infringing volumes will not be allowed as an item of expense in producing them.

7. SAME—COST OF UNSOLD VOLUMES.

    Where the infringer has not been required by the decree of the court to surrender the unsold infringing volumes, but has been restrained from selling them, and has retained them in his possession, he cannot be credited for the cost of these volumes in order to determine the profits of those already sold.

8. SAME—BURDEN OF PROOF.

    While a court will not presume that all the money received by a piratical publisher on the sale of his books is profit, still, as the proof as to the cost of producing the work is wholly in the control of the defendant, the complainant makes a *prima facie* case of right to recover by showing the selling price and the usual manufacturers' cost.

Exceptions to Master's Report.

*J. V. Le Moyne* and *Geo. W. Cothran,* for complainant.

*Jas. L. High,* for defendants.

BLODGETT, J. The original bill in this case charged that complainant was owner of the copyright of volumes 32 to 38, inclusive, of the reports of the decisions of the supreme court of Illinois, and that defendants had infringed the same. By the supplemental bill complainant charged that he was the owner of the copyright of volumes 39

to 46, inclusive, of the same series of reports, and that defendants had infringed upon his right as such owner, and an accounting was decreed as to both bills, after hearing on the pleadings and proof, and reference was made to masters to ascertain and report the amount of defendants' profit in the publication and sale of the infringing volumes; the case made under the original bill having been referred to Bishop, master, and the case made under the supplemental bill having been referred to Bennett, master.   These masters have respectively made their reports; Mr. Bishop, by his report, finding that defendants should be charged with $13,451.19 as the proceeds of the sale of volumes 32 to 38, and that they were entitled to be credited with $6,465.14 as the proper cost of producing said volumes, thus leaving profit of $6,986.05, for which he recommended a decree be made.   This report was on the basis that the average sale of these volumes by defendants was at the rate of $4.62½ per volume, which the master concluded was a fair average price, as shown by the proofs. Mr. Bennett, by his report, found that the defendants should be charged with $10,231.48 as the proceeds of sales of volumes 39 to 46, inclusive, and that they were entitled to be credited with $5,798.44 as the proper cost of producing said volumes, thus leaving a profit to the defendants of $4,433.44, for which he recommended a decree.

Both complainant and defendants have filed exceptions to these reports, and these exceptions have been argued orally, and by briefs supplementing the oral arguments.

The objections urged on behalf of complainant are mainly to the report of Mr. Bennett.   The first objection is that the master refused to allow, as part of complainant's damages, the profits of the defendants on about 156 of the infringing volumes which had been sold by defendants and purchased in again as second-hand books, and resold; the master holding that, having charged the defendants with the profits on the first sale of these volumes, they had a right to buy them in at second hand, and could then sell them again without accounting for the second profit.   I think this exception well taken.   The law intends to secure the owner of a copyright of any book or literary composition the monopoly of the market for such book,—that is, the right to supply all who wish to purchase,—and if the infringing publisher can buy at second hand the infringing publication, and again place it on the market, to that extent he supplants the owner of the copyright, who has the right to supply the demand.   It is well known that many books are purchased only to serve a temporary purpose by the purchaser, and when that purpose has been served, the purchaser puts the book again upon the market.   When he does so, and finds a purchaser, he, to that extent, interferes with the owner of the copyright.   While it may be true, if an infringing publisher has sold a volume and accounted to the owner of the copyright, the purchaser of that volume holds it free of any claim by the owner of the copyright, yet I do not understand that such purchaser can put

the work again upon the market without accounting to the owner of the copyright; and the case seems much stronger, from an equitable point of view, when the infringing publisher buys the book or volume he has thus sold, and again puts it upon the market and supplies the customer who, otherwise, would have been compelled to buy from the owner of the copyright. I therefore conclude that the master should have charged the defendants with the profit on these resales.

The next exception of complainant to Mr. Bennett's report goes to the mode by which the master arrived at the average price at which defendants sold the infringing volumes 39 to 46. The defendants are publishers of and dealers in law books in the city of Chicago. They own the copyright or control the sale of volumes of the Illinois Reports from 1 to 31, inclusive. Mr. Freeman, the present reporter of the supreme court, owned the copyright of all the volumes above 46, and the most of these sales were made in sets, the infringing volumes being used to fill out the sets. Defendants purchased the volumes above 46 of Mr. Freeman at his regular rate; and, for the purpose of determining the selling price of the infringing volumes, the master deducted from the amount received for a full set of reports the amount paid Mr. Freeman, and then divided the balance by 46 to obtain the price at which defendants sold the infringing volumes, thus making the selling price of the infringing volumes and those owned or sold by defendants the same, and by this rule the average selling price of the infringing volumes is $4.34, while the complainant insists, from the proof before the master of separate sales by defendants of nearly 400 copies of the infringing volumes, an average price of $4.58 8-10 is shown; but the master, in consideration of the impossibility of ascertaining from the proof the exact price which defendants had received for the infringing volumes, split the difference between the price arrived at by the defendants' rule and that contended for by the complainant; and fixed the selling price at $4.46 4-10 per volume. In this, I think, the master approximated as nearly to the true amount as could be done, and I am not disposed to disturb his action in that regard. It is conceded that the exact selling price cannot be arrived at from the proof. It also appears that about 400 copies were sold at higher rates than results from the price by sets, and I think the master was justified in taking the mean result of the two methods.

The next objection involves the conclusion by both masters as to the percentage of the general average expenses of defendants' business, which should be deducted from the proceeds of the sales of the infringing volumes; the objection being mainly urged on the ground that defendants had not clearly and actually shown from their books and other sources of proof the percentage of their expenses to their receipts in the transaction of their business during the time the infringement was going on. Inasmuch as the object of an inquiry like this is to ascertain the profits which defendants have made, or ought to have made, from their infringement of the copyright, and award those prof-

its by way of damages to the complainant, so that the defendants shall make no gain by their piracy, it is clear that, in order to arrive at these profits, we must, as nearly as practicable, ascertain the proper cost to defendants of manufacturing the infringing volumes, and the cost of selling the same; or, in other words, if the cost of selling these particular books was only a part of defendants' business, how much of the general expenses of the defendants in conducting their business should be deducted from the proceeds of these sales. The defendants contended that the proof shows that it cost them 17 per cent. of the gross proceeds of sales to sell their books, and that, therefore, they were entitled to a credit of that amount from the proceeds of the sales, in addition to the cost of production. Mr. Bennett concluded from the proof before him that 12 per cent. was a fair allowance to the defendants for their general expense credit, and Mr. Bishop, from the proof before him, allowed 12 7-8 per cent. for these average expenses. Without discussing, which, it seems to me, it would not be profitable or material at this stage of the case to do, the question as to who had the burden of proving the credit to be allowed defendants from the gross proceeds of their sales in order to determine their profits, it is sufficient to say that the conclusions of the two masters as to the percentage of this general expense account are so nearly alike that I am fully content to allow their findings in this regard to stand. If the testimony before Mr. Bennett was left in any respect incomplete or unsatisfactory, by reason of defendants' declining to produce papers or books, the complainant could, by proper application to the court, have compelled the production of such books; and, having failed to make such application, it is now too late to complain on that ground. Both parties submitted before the master such proof as they saw fit upon the question of expense, and if either of them thought more proof necessary and obtainable, they should have applied to the court for it in apt time.

The next objection is in regard to the finding of Mr. Bishop as to the price at which defendants sold volumes 32 to 38, inclusive. He found the average price per volume at which the defendants sold the infringing volumes 32 to 38 was $4.62$\frac{1}{2}$, while the plaintiff insists that the price, as fixed by the proof of sales of separate volumes, and defendants' catalogue of prices, should have been found much higher. I have examined the proof, and am content with the master's finding in this regard. As I have said, in regard to Mr. Bennett's finding, it is impossible to determine from the evidence the exact average price per volume, and also impossible to determine the exact price at which defendants sold each infringing volume. The master seems to me to have carefully considered all the proof before him, and, I think, has fairly approximated to the truth.

Upon the accounting the defendants claimed, as part of the expense of producing the infringing volumes, the cost of making stereotype plates, instead of printing the edition from the type. This item is

conceded by the proof to be equal to 50 per cent. of the cost of composition; that is, if it cost $500 to set the type for a volume, it costs $250 more to make stereotype plates, thus making the plates for the volume cost $750. Both masters, on the accounting, rejected this item, and allowed only the cost of type-setting, press-work, binding, and the cost of materials used in producing the infringing volume, and defendants' first exception goes to the refusal of both masters to allow them for this expense of stereotyping. I think the testimony before the masters upon this point shows quite satisfactorily that it is now a common practice among publishers of standard books to stereotype the matter and print from the stereotype plates; but it shows with equal certainty that stereotyping is merely a convenience to the publisher, and not a necessity, and I fully concur with the masters who have considered this case that an infringer should not be allowed to charge an unnecessary cost against one whose rights he has invaded. The defendants have been found by the decrees in this case to have been trespassers and wrong-doers in the premises, and should not be permitted to charge the complainant with this stereotyping expense, which they might, perhaps, have properly incurred if they had had the lawful right to publish these volumes. The defendants must be held to have known at the time they incurred this expense that they were wrong-doers, and could not proceed in all respects as though they had a right to publish these books, and make their arrangements to continue the publication as the demand should arise for future editions, while all these expenses might with entire propriety have been incurred by one who had the lawful right of publication.

The next exception by the defendants is the refusal of both masters to allow the salaries of the several defendants as part of the general expense of conducting their business. The proof shows that the partnership agreement between the defendants contained provisions by which each member of the firm was entitled to draw out of the business for his personal expenses and support a specific sum per annum, and the contention of defendants is that the sum so drawn out by the respective partners is part of the general expenses of the firm in conducting its business, and should be included in order to arrive at the percentage of such expenses; but I agree with the masters that the complainant is not equitably obliged to contribute to the support of the defendants while they are engaged in destroying his property, as would be the case if the court should sustain the position of the defendants in this regard.

The only case which seems to support the defendants' position in this respect is *Rubber Co.* v. *Goodyear*, 9 Wall. 788; but that was a suit against an incorporated company, and the salaries of its officers for conducting its business were deemed part of the proper expenses of the company, thus differing, as it seems to me, in principle from this case.

The next objection by the defendants to the master's report is that both masters refused to allow as an item of defendants' expense in producing the infringing volumes in question certain sums paid by defendants for editing these volumes. It seems to me this objection is fully met by the decree of the court holding that these volumes infringe the complainant's copyright. It is said that, although the court so found, yet the defendants paid quite a considerable sum for editing these volumes; but neither the masters nor the court can draw the line and say how much of this editorial work ought to be paid for or allowed. The court has found that the books, as published, violated the complainant's copyright, and, so far as the complainant is concerned, it can make no difference whether the defendants have paid for editing them or not. They might as well, for the purposes of this case, have copied the books bodily, without editorial help, as to have imitated them to the extent found by the court.

Defendants also except to the finding of the masters as to the average selling price of the volumes. I have already said, in discussing the exceptions of complainant, all that I deem necessary as to these exceptions by defendants.

It is also contended by defendants that Mr. Bennett erred in finding that the defendants had made any profit by the publication of volumes 39 to 46, and insisted that the proof showed they had made no profits whatever out of the publication of these volumes. Much of the argument has already been considered in discussing the item of stereotyping, salaries, editorial work, etc., but it is also urged that Mr. Bennett erred in not allowing the defendants for the cost of the unsold volumes; the defendants contending that they should be credited for the cost of these volumes in order to determine the profits of those already sold.

The decree in the case does not require the defendants to surrender these volumes to complainant, but merely enjoins the defendants from selling them. If the defendants should offer to surrender the volumes on hand to the complainant, it would be equitable to require the complainant to allow the cost of these volumes in the accounting; but so long as the defendants decline, or, at least, do not offer, to turn these unsold volumes over to the complainant, it does not seem to me right that they should be allowed the cost of producing them. Undoubtedly, the defendants prefer to retain the possession of these volumes, under the injunction restraining their sale, until they have tested the questions raised in the case by an appeal to the supreme court, rather than surrender them to the complainant, and, so long as they elect to do this, it seems to me the finding of the master is correct.

I have thus gone through the exceptions topically, rather than *seriatim*, and have, I think, considered all the points raised in the numerous exceptions filed. In regard to the question as to who has the burden of proof as to the amount of defendants' profit it seems to me that, while the court will not presume that all the money received

by a piratical publisher on the sale of his books is profit, still, as the proof as to cost of producing the work is wholly in the control of the defendants, the complainant makes a *prima facie* case of right to recover by showing the selling price, and the usual manufacturers' cost. The defendants, if for any reason they are not content to abide by the proof as to ordinary cost of production to the trade, must take the burden of showing by their own proof what their actual legitimate expenses were.

The complainant's first and second exceptions to Mr. Bennett's report are sustained, and all the other exceptions filed by complainant and defendants are overruled, and a re-reference ordered to Mr. Bennett to state the account as to the profits of the resold volumes, unless the parties shall stipulate as to such profits.